No. 16-1419

_____

# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

_____

WASHINGTON UNIVERSITY,

*Plaintiff-Appellant,*

v.

WISCONSIN ALUMNI RESEARCH FOUNDATION,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for the District of Delaware,
case no. 1:13-cv-02091, Judge Gregory M. Sleet

_____

## NON-CONFIDENTIAL BRIEF FOR PLAINTIFF-APPELLANT WASHINGTON UNIVERSITY

_____

MICHAEL A. JACOBS
CHRISTOPHER ROBINSON
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105
Telephone:   415.268.7455

DEANNE E. MAYNARD
MARC A. HEARRON
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Telephone:    202.887.8740

JOHN G. DAY
ANDREW C. MAYO
ASHBY & GEDDES, P.A.
500 Delaware Avenue
P.O. Box 1150
Wilmington, Delaware  19899
Telephone:  302.654.1888

*Counsel for Plaintiff-Appellant Washington University*

June 27, 2016

## CORPORATE DISCLOSURE STATEMENT AND
## STATEMENT OF FINANCIAL INTEREST

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit LAR 26.1, Washington University makes the following disclosure:

1.    For non-governmental corporate parties please list all parent corporations:

None

2.    For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

None

3.    If there is a publicly held corporation which is not a party to the proceeding before this Court but which has a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

N/A

4.    In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee of the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding.  If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

N/A


Dated:  June 27, 2016                                    s/ Deanne E. Maynard
                                              _____

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT AND STATEMENT OF FINANCIAL INTEREST ........................................................................ i

TABLE OF AUTHORITIES .................................................................. iv

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF THE ISSUES................................................................1

STATEMENT OF RELATED CASES AND PROCEEDINGS ..............................1

INTRODUCTION ...............................................................................2

STATEMENT OF THE CASE.................................................................5

    A.    Factual Background......................................................5

        1.    Development of paricalcitol (Zemplar) through collaboration between Washington University and the University of Wisconsin .............................................5

        2.    The Inter-Institutional Agreement between Washington University and WARF ...............................................6

        3.    WARF's pursuit of the jointly owned patent............................9

        4.    WARF's license of the jointly owned patent...........................10

        5.    WARF's periodic royalty payments to Washington University based on an unfair relative valuation of the jointly owned patent.................................................11

        6.    WARF's concealment of important facts about the true value of the co-owned patent ..................................13

        7.    Washington University learns that the co-owned patent is a key patent covering Zemplar.................................17

        8.    The co-owned patent is one of the most valuable patents in the 1998 Abbott portfolio ....................................19

ii

B.　　Proceedings Below ............................................................21

SUMMARY OF ARGUMENT ...........................................................24

STANDARD OF REVIEW ...............................................................27

ARGUMENT ...................................................................................28

I.　UNDER WISCONSIN'S PERIODIC PAYMENTS DOCTRINE, WASHINGTON UNIVERSITY'S CLAIMS ARE TIMELY BEGINNING SIX YEARS BEFORE THE PARTIES' TOLLING AGREEMENT.............................................................................28

　　A.　　Under Wisconsin Law, Where, As Here, One Party Owes A Contractual Duty To Make Periodic Payments, A New Claim For Breach Accrues With Each Underpayment ..................................28

　　B.　　The District Court's Conclusion Is Contrary To Governing Law ......34

II.　MATERIAL DISPUTES OF FACT EXIST AS TO WHETHER WARF'S MISCONDUCT EQUITABLY ESTOPS IT FROM ASSERTING THE STATUTE OF LIMITATIONS DEFENSE FOR CLAIMS FILED OUTSIDE THE LIMITATIONS PERIOD .....................40

　　A.　　Washington University Put Forward More Than Enough Evidence To Warrant A Trial On Equitable Estoppel ........................41

　　B.　　The District Court Misunderstood The Significance Of WARF's Concealment And Failed To View The Evidence In The Light Most Favorable To Washington University ......................48

　　　　1.　　The district court fundamentally misunderstood the significance of the evidence WARF concealed ........................48

　　　　2.　　The district court resolved factual disputes and failed to view the evidence in the light most favorable to Washington University ............................................................51

CONCLUSION ................................................................................58

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Affordable Erecting, Inc. v. Neosho Trompler, Inc.*,
715 N.W.2d 620 (Wis. 2006)....................................................27, 41, 42

*Barry Aviation Inc. v. Land O'Lakes Municipal Airport Comm'n*,
377 F.3d 682 (7th Cir. 2004) ..................................................41, 44, 48

*Butler v. Kirby*,
10 N.W. 373 (Wis. 1881)...................................................28, 29, 35, 37

*Elliott v. Gen. Cas. Co. of Wis.*,
807 N.W.2d 33, 2011 WL 5120370 (Wis. Ct. App. 2011) .................................42

*Jahn Transfer, Inc. v. Horizon (H&S) Freightways, Inc.*,
819 N.W.2d 563 Wisc. App. LEXIS 484 (Wis. Ct. App. 2012) ........................39

*Jensen v. Janesville Sand & Gravel Co.*,
415 N.W.2d 559 (Wis. Ct. App. 1987)........................... 30, 31, 33, 34, 35, 36, 37

*Josey v. John R. Hollingsworth Corp.*,
996 F.2d 632 (3d Cir. 1993) ......................................................27, 51

*Lutz v. Chesapeake Appalachia, LLC*,
717 F.3d 459 (6th Cir. 2013) .............................................................33

*Md. Staffing Servs., Inc. v. Manpower, Inc.*,
936 F. Supp. 1494 (E.D. Wis. 1996) ...................................................31

*Messner Manor Assocs. v. Wis. Hous. & Econ. Dev. Auth.*,
555 N.W.2d 156 (Wis. Ct. App. 1996)....................................38, 39, 40

*Noonan v. Northwestern Mutual Life Insurance Co.*,
687 N.W.2d 254 (Wis. Ct. App. 2004)....................................31, 32, 35

*Policemen's Annuity & Benefit Fund v. City of Milwaukee*,
630 N.W.2d 236 (Wis. Ct. App. 2001)................................. 27, 32, 35, 41, 42, 48

*Segall v. Hurwitz*,
339 N.W.2d 333 (Wis. Ct. App. 1983)....................................29, 30, 35

iv

*State ex rel. Susedik v. Knutson*,
    191 N.W.2d 23 (Wis. 1971) ............................................................................41

*Welter v. City of Milwaukee*,
    571 N.W.2d 459 (Wis. Ct. App. 1997) ........................................................31

**STATUTES**

21 U.S.C. § 355(b)(1) ........................................................................................16

21 U.S.C. § 355(j)(2)(B)(iii)(I) ........................................................................54

28 U.S.C. § 1291 .................................................................................................1

28 U.S.C. § 1332(a)(1) ........................................................................................1

Wis. Stat. § 809.23(3)(b) ..................................................................................39

Wis. Stat. § 893.43 ............................................................................................21

**OTHER AUTHORITIES**

21 C.F.R. § 314.53(c)(2)(ii) ..............................................................................16

21 C.F.R. § 314.53(e) ........................................................................................16

10-53 Corbin on Contracts § 53.14 ............................................................32, 33

10-53 Corbin on Contracts § 53.6 ..............................................................32, 33

31 Williston on Contracts § 79:17 (4th ed.) ...........................................33, 35, 36

FDA, Approved Drug Products with Therapeutic Equivalence Evaluations,
    http://www.fda.gov/Drugs/InformationOnDrugs/ucm129662.htm ...................17

Fed. R. Civ. P. 56(a) .........................................................................................27

Restatement (Second) of Contracts § 243 (1981) ..........................30, 31, 33, 34, 36

## JURISDICTIONAL STATEMENT

The district court had diversity jurisdiction under 28 U.S.C. § 1332(a)(1). Final judgment was entered on January 25, 2016.  Plaintiff-appellant Washington University appealed on February 24, 2016.  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Whether Washington University's contract claims seeking damages for Wisconsin Alumni Research Foundation's ("WARF's") underpayment of royalties are timely under Wisconsin's six-year statute of limitations with respect to annual payments due since six years before the parties' standstill agreement. A13-14; A93-96, A757-60; A283-85, A1092-94; A345-46, A1215-16; A687-92, A2258-63; A707-11, A2282-86; A721-22, A2299-2300.

2.    Whether disputed issues of fact preclude summary judgment as to whether WARF's misconduct equitably estops it from asserting the statute of limitations as a defense against any of Washington University's contract claims filed outside the limitations period.  A15-21; A96-96, A757-60; A346-48, A1216-18; A722-24, A2300-02.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not been before this Court previously.  Washington University is unaware of any other case or proceeding that is in any way related, completed,

pending, or about to be presented before this Court or any other court or agency, state or federal.

## INTRODUCTION

Washington University and WARF are the parties to an Inter-Institutional Agreement ("IIA" or "Agreement") that governed their relationship with respect to a patent that they jointly own.  Under the Agreement, WARF was responsible for securing licensing arrangements with third parties so that the patent would generate a stream of licensing income.  The Agreement permitted WARF to license the co-owned patent as part of a portfolio that included patents that WARF solely owned. WARF did so, licensing the co-owned patent together with 33 other patents that WARF solely owned.

The Agreement also spelled out how, if WARF licensed the co-owned patent as part of a portfolio of patents, the income stream from license royalties was to be shared.  Each year, the Agreement required WARF to divide the overall income stream for that year according to the co-owned patent's "relative value"—i.e., its value in comparison with the value of the WARF-owned patents in the license— and to distribute to Washington University a portion of the income allocated to the co-owned patent.

Acting under these provisions, WARF entered into a portfolio licensing agreement with Abbott Laboratories for what became a blockbuster drug that

generated enormous revenues for WARF.  But WARF assigned slightly less than a 1% relative value to the co-owned patent, and remitted amounts to Washington University accordingly.

In 2012, Washington University first became aware that WARF and Abbott were asserting that the co-owned patent was one of only three patents blocking generic drug competition, and concluded that the co-owned patent was far more valuable than WARF's allocation reflected.  After entering into a standstill and tolling agreement and attempting negotiations, Washington University brought this suit, asserting claims that WARF breached the Agreement each year by failing to pay Washington University a proper share of the annual royalties.  Washington University discovered that WARF had engaged in untruths and misdirection over the course of the parties' relationship to prevent Washington University from learning the true relative values of the licensed patents.  WARF's improper valuations resulted in a windfall to WARF, which retained over $400 million in royalties while remitting just over $1 million to Washington University.

The district court held that all of Washington University's contract claims are barred by the six-year statute of limitations—even its claims based on the underpayments made in the six years preceding the parties' standstill and tolling agreement.  That decision conflicts with more than 100 years of Wisconsin law. Under the well-established periodic payments doctrine, where a party has a

continuing obligation to make periodic payments, a new claim for breach of contract accrues with each improper payment, and the injured party may assert a claim for damages within six years of each breach. Here, a separate breach of contract occurred each time WARF distributed annual income to Washington University based on an arbitrarily assigned, unfairly low relative value. Washington University's contract claims were thus timely going back six years before the parties' agreement to toll the statute of limitations. The periodic payments doctrine requires reversal and remand to decide the merits of at least the claims during this period of time.

What is more, WARF should be equitably estopped from relying on the statute of limitations as to all of Washington University's claims, back to the first breach. In concluding on summary judgment that Washington University's evidence did not support equitable estoppel, the district court fundamentally misunderstood the import of that evidence and failed to view it in the light most favorable to Washington University. The evidence showed that WARF wrongfully concealed key information that would have allowed Washington University to learn that WARF's annual payments to Washington University were far smaller than they should have been. If disclosed, that information would have allowed Washington University to sue within the limitations period for each of WARF's breaches. The district court improperly viewed the evidence in the light most

favorable to WARF, which led it to resolve factual disputes in WARF's favor.  But when the evidence is viewed in the light most favorable to Washington University (as it must be at this point), there are material disputes of fact concerning equitable estoppel that preclude summary judgment for WARF based on the statute of limitations.  The case thus also should be remanded for a trial on Washington University's equitable estoppel claim.

## STATEMENT OF THE CASE

### A.    Factual Background

#### 1.    *Development of paricalcitol (Zemplar) through collaboration between Washington University and the University of Wisconsin*

Dr. Eduardo Slatopolsky, Professor of Renal Diseases at the Washington University School of Medicine, co-developed a new method of treating illnesses associated with kidney diseases.  A397; A453-62.  One complication of chronic kidney failure is secondary hyperparathyroidism—i.e., an excessive secretion of parathyroid hormone.  A125; A454.  Calcitriol—the active metabolite of Vitamin D—suppresses parathyroid hormone and has been used to treat secondary hyperparathyroidism.  A454.  But calcitriol often causes dangerous increases in blood calcium and phosphate levels—conditions known as hypercalcemia and hyperphosphatemia.  A125; A405; A454-55.

Dr. Slatopolsky was the first scientist to determine that an analog of calcitriol called paricalcitol suppresses parathyroid hormone without causing hypercalcemia or hyperphosphatemia and is thus a more effective treatment than calcitriol.  A402-06, A408-09;  A1556.  Dr. Slatopolsky reached that conclusion through studies designed and carried out in his own lab, using compounds supplied by Dr. Hector DeLuca of the University of Wisconsin.  A403-06, A408-09; A1336-42.  Dr. Slatopolsky's studies provided the scientific support for securing patent protection for the use of paricalcitol to treat kidney diseases.  A1329-33; A453-62; A401.

### 2.    *The Inter-Institutional Agreement between Washington University and WARF*

Washington University and WARF entered into the Agreement to govern how they would pursue patent protection for the joint invention and share royalties from licensing the patent to others.  A292-300.  It is common practice with inter-institutional agreements for one party to be deemed the "senior party" and to take the lead in handling certain responsibilities with respect to jointly owned intellectual property.  A2071.  Here, Washington University entrusted WARF to be the senior party, giving WARF decision-making powers concerning applying for and prosecuting patent protection, as well as licensing and enforcing patent rights. A294-95, A298-99 (Sections 2.A.(i), 2.B.(i), 9.A).

But with those powers came responsibilities. WARF had the duty to "seek a Licensee(s) for the commercial development of Patent Rights" and the "authority to enter into negotiations and execute License Agreement(s)." A295 (Section 2.B.(ii)-(iii)). WARF was obligated to "administer all License Agreement(s) for the mutual benefit of the parties." A295 (Section 2.B.(ii)). WARF and Washington University agreed they would "use all reasonable efforts to cooperate with each other with respect to patent application preparation, filing, prosecution, maintenance, *licensing*, and execution of assignments." A294 (Section 2.A.(iii)) (emphasis added).

The Agreement contemplated that, rather than license the parties' co-owned patent separately, WARF might include it in a portfolio of patents that WARF would license as a package. A296 (Section 3.A.(iii)). That portfolio might include WARF-owned patents in which Washington University does not have any ownership interest. A296 (Section 3.A.(iii)).

The parties agreed to "shar[e] income derived from licensing" the patent and spelled out how the income received in any given year would be distributed. A293 (third whereas clause). If WARF licensed the jointly owned patent as part of a portfolio—as it did here—calculating Washington University's share of the income in any given year required allocating the income attributable to the parties' co-owned patent and the income attributable to the other patents in the portfolio. Each

year's division of royalty income was to be based on the "relative values" of each patent "in proportion to the total value represented by all patent rights and/or proprietary rights which are included within such license." A296 (Section 3.A.(iii)).

WARF had the "authority to assign relative values" to the patents in the portfolio. A296 (Section 3.A.(iii)). WARF's authority is constrained by its obligation to administer the license for the "mutual benefit" of the parties (A295 (Section 2.B.(ii))) and by the implied covenant of good faith and fair dealing. A21. WARF therefore was required to assign relative values using fair and reasonable criteria, in good faith, and in accordance with standard industry practices. A1244-49; A1310-11; A1401-02; A2074, A2094-95. While the Agreement did not explicitly state the factors to be taken into account when assigning relative values, Washington University's evidence showed that it is common practice in the industry to assign relative value based on factors including the nature of the patent claims, their relevance to any named compounds or products in the license agreement, whether the patent was licensed exclusively or non-exclusively, and the remaining life of the patent. A2074-75. Washington University's evidence also showed that it is usual practice to reevaluate the relative values of patents in a portfolio in light of significant events. A2075. For example, when a patent in the

portfolio expires, it is common practice to redistribute its relative value to the other patents in the portfolio. A2075-76.

Once income attributable to the parties' jointly owned patent was determined, certain fees and expenses were deducted from that income. A294-95 (Sections 1.F., 1.G., 2.B.(iv)). Out of the remaining amount each period, Washington University was entitled to receive 33-1/3%. A294-95 (Sections 1.H., 3.A.(i)(1)).

WARF was required to perform these calculations each year and distribute to Washington University its share of that year's income. A297 (Section 5.B).

### 3. *WARF's pursuit of the jointly owned patent*

WARF's Dr. DeLuca took Washington University's Dr. Slatopolsky's data to a WARF patent attorney and pursued patent protection for their co-invention. A1353-54. Dr. DeLuca did not involve Dr. Slatopolsky in any of the discussions with WARF's patent attorneys. A1353-54. Without coordinating with Washington University, WARF attempted to get Dr. Slatopolsky to assign all his interest in the co-invention to WARF. A1278-79. Although Dr. Slatopolsky signed the assignment agreement, it is undisputed that the assignment was defective because Dr. Slatopolsky already had assigned his interest to Washington University. A1558-59. WARF's expert could not think of any legitimate explanation for WARF's actions. A1278-79.

When seeking a patent from the U.S. Patent and Trademark Office ("PTO"), WARF submitted a form to notify the PTO that Dr. Slatopolsky had assigned his interest in the co-invention.  A1561-64; A2081.  It is uncontested that the form is incorrect:  WARF falsely represented on the form that Dr. Slatopolsky had assigned his interest to WARF rather than to Washington University.  A1562. WARF did attach to that form the actual assignment document in which Dr. Slatpolosky assigned his interest to Washington University.  A1562-64.  But the PTO recorded Dr. Slatopolsky's assignment as being to WARF, and WARF did not correct that until 2012, under pressure from Washington University. A2081-82.

In January 1997, the PTO issued U.S. Patent No. 5,597,815 ("'815 patent") for the parties' co-invention.

### 4.    *WARF's license of the jointly owned patent*

Immediately after the PTO informed WARF that the '815 patent would issue, WARF touted the significance of the new patent to pharmaceutical manufacturer Abbott Laboratories.  A1006-07.  WARF and Abbott had a preexisting and longstanding licensing relationship relating to a forerunner to paricalcitol.  A1365; A1373-74.  WARF told Abbott that the '815 patent "will provide additional protection for Abbott with their new [paricalcitol] product on the marketplace" and proposed to add the '815 patent to the existing license

agreement between WARF and Abbott.  A1006.  In June 1998, shortly after Abbott launched paricalcitol under the brand name Zemplar, WARF again wrote Abbott about the importance of licensing the jointly owned patent, stating:  "We recognize that this technology *directly supports* the Abbott Zemplar™ product and it is appropriate to add this to the licensed patent list."  A1010 (emphasis added); *see* A1259.  WARF did not inform Washington University of these communications, nor of WARF's conclusion that their co-owned patent directly protected Abbott's Zemplar drug product.  A2088-89, A2090-91; A1291-92, A1297.

In July 1998, WARF and Abbott entered into a new license agreement for Zemplar.  A797-827.  The license agreement contains two lists of patents covered by the agreement:  "Licensed Patents" and "Ancillary Patents."  A808-22.  There were only two U.S. patents in the "Licensed Patents" group; both were WARF-owned patents.  A808; A2100-01.  The '815 patent was listed as one of thirty-one U.S. Ancillary Patents.  A820.  Among all the patents in the license agreement, the '815 patent was the only co-owned patent; the others were owned solely by WARF.  A1503-04.

### 5.    *WARF's periodic royalty payments to Washington University based on an unfair relative valuation of the jointly owned patent*

WARF admitted that it did not actually undertake a process to determine the relative value of each of the patents covered by the 1998 Abbott License.  A1383.

Instead, WARF arbitrarily assigned 70% value to the two Licensed Patents and 30% to the thirty-one Ancillary Patents. A842, A858.[1] WARF then arbitrarily deemed each of the thirty-one Ancillary Patents, including the co-owned patent, as having equal value. This resulted in a 0.968% allocation to the co-owned patent and a 99.032% allocation to the WARF-owned patents. A835, A851.

WARF made its first income distribution to Washington University on November 25, 1998, and made annual payments each year thereafter. A1098-99.

In January 1999, WARF abandoned a patent application that it had included in the Ancillary Patents, i.e., the 30% allocation group. Shortly thereafter, for purposes of distributing WARF's share of the royalties to WARF's inventors, WARF removed the abandoned patent application from the 30% group and performed a reallocation, assigning a 1% value to each of the thirty patents

---

[1] WARF's allocation can be seen in its Income Division Memos. A832-45; A848-61. The memos list WARF's internal "case codes," rather than patent numbers. Each case code could correspond to a single patent or a family of patents. The memos show that 70% was allocated to case code "P89130US," which corresponds to two WARF-owned patents. A842, A858; A2100-01. The co-owned '815 patent is listed as case code "P95011US" in the 30% group. A842, A858; *see* A820.

remaining in the 30% group (including the co-owned '815 patent).[2]  For purposes of paying Washington University, however, WARF continued making payments based on the 0.968% valuation.  A1592.  Moreover, although WARF performed this reallocation, WARF never reassessed the value of the co-owned patent in light of later events (discussed below) that confirm that the relative value of the co-owned patent is far higher than 1%.  *See infra*, pp. 16-17.

Abbott's Zemplar has generated ███████ in total sales revenues.  A2209-10.  WARF has received $425 million in royalties from Abbott; of that $425 million, it has remitted only just over $1 million to Washington University.  A2209-10.[3]

### 6.    *WARF's concealment of important facts about the true value of the co-owned patent*

Over the course of the parties' relationship, WARF systematically concealed from Washington University facts that would have revealed that WARF's

---

[2] In its November 1998 Income Division Memo, WARF listed thirty-one case codes in the 30% group, including "P97063US" and "P97064US."  A842. Those case codes corresponded to two patent applications both titled "Use of Vitamin D Compounds to Prevent Transplant Rejection."  A821.  On January 21, 1999, after WARF abandoned the patent application corresponding to "P97064US," WARF issued a replacement Income Division Memo.  A848.  The new memo listed thirty case codes in the 30% group.  A858.  "P97063US" and "P97064US" had been replaced with "P98272US."  *Compare* A842, *with* A858.

[3] The co-owned patent's term has expired in the United States.  A1530. Foreign equivalents of that patent will remain in effect until at least July 2016.

assignment of relative value to the jointly owned patent was improperly low and unfairly favored WARF.

In May 1998, Washington University requested access to the license agreement with Abbott.  A171.  Access to the license was crucial because otherwise Washington University could not determine for itself whether WARF had fairly assigned a relative value to the co-owned patent.  A433-36.  Without the license, Washington University had no way to know which patents were covered by the license and thus could not evaluate how the jointly owned patent compared to the other patents licensed in the portfolio.  A2092; A433-36; A1295-96.  The same day, WARF denied Washington University's request for access, falsely telling Washington University that the Abbott License was confidential and could not be shared with WARF.  A171.  Only through discovery in this case did Washington University learn that WARF's confidentiality assertion was untrue.  A2089-90; A1295.[4]

In 2001, in response to a specific request from Washington University, WARF provided a false explanation of how it assigned a 0.968% relative value to the co-owned patent.  A1591-92; A2097-2102.  WARF stated that it had a "regular

---

[4] WARF also maintained in this litigation that the Agreement between Washington University and WARF was confidential and needed to be filed under seal.  But even though WARF drafted the Agreement, it included no clause requiring that it be kept confidential.  A293-300.  The district court rejected WARF's confidentiality assertion.  A66-75.

practice" of allocating 70% to the patents that cover the drug compound itself—in contrast with, for example, a patent covering a method of drug use or method of drug treatment. A1591. WARF also stated that "[i]t is WARF's policy to allocate evenly among" the remaining patents "because, in many cases, it is difficult if not impossible for WARF to determine whether or not the patent is being used by the Licensee at this time." A1591.

In fact, as Washington University has learned through discovery in this suit, WARF had no such practice or policy. A2098-2102. It has never produced any written documentation of such a policy, and its actions have been inconsistent with this purported policy. One of the patents that WARF included in the group that was assigned 70% value was a WARF-owned method-of-use patent, not a compound patent. A2100-01. That patent was comparatively weaker than the '815 patent, yet it was assigned a vastly larger relative value. A2103-05. Furthermore, WARF's relative-value assignments in the context of several other Vitamin D portfolio licenses did not adhere to the 70%/30% split that WARF claimed was its regular practice. A2100. ███████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████ A2098-99; A1573, A1585-86.

WARF's concealment continued in other significant ways. In 2008, when evaluating the importance of the jointly owned patent to Abbott and to the Zemplar royalty stream under the Abbott License, WARF concluded that the co-owned patent was important because it was the only licensed patent that would continue covering Zemplar's use after expiration of the compound patent. A2092-93; A1594; A1461-63, A1466-68. And WARF determined that it covered "exactly the application and population Abbott targets and sells Zemplar for." A1594. WARF never told Washington University about that conclusion. A2093; A1471-72. Nor did it adjust the relative valuation of the '815 patent.

In 2011, with WARF's prior knowledge and approval, Abbott listed the '815 patent as protecting Zemplar in the "Orange Book" at the Food and Drug Administration ("FDA"). A1387-88; A1709-11. The Orange Book alerts generic drug manufacturers to the branded drug manufacturer's claimed scope of patent rights. For each approved drug, the branded manufacturer must submit to the FDA the numbers and expiration dates of any patents that the manufacturer contends cover the drug or its approved method of use. 21 U.S.C. § 355(b)(1); 21 C.F.R. § 314.53(c)(2)(ii). The FDA lists these patents in its book of "Approved Drug Products with Therapeutic Equivalence Evaluations," i.e., the Orange Book. *See* 21 C.F.R. § 314.53(e); FDA, Approved Drug Products with Therapeutic

16

Equivalence Evaluations.[5]   WARF never told Washington University about the listing of their co-owned patent in the Orange Book.  A2093-94.

Beginning in 2012, WARF and Abbott asserted the co-owned patent in patent infringement litigation against eight generic drug manufacturers, seeking to block generic competition for Zemplar.  A2109-10; A518-668.  WARF never identified Washington University as a co-owner of the '815 patent in the litigation or informed Washington University that its patent was being asserted in litigation.  A1280-81; A2109-11.  To the contrary, WARF represented to generic competitors and the district court that WARF alone owned the '815 patent.  A2084-86; A1719; A1746.  WARF's recordation of inaccurate assignment information with the PTO and its false ownership assertions in litigation prevented Washington University from learning about these events.  A1280-81.

### 7.    *Washington University learns that the co-owned patent is a key patent covering Zemplar*

On September 27, 2012, Washington University received a subpoena from generic manufacturer Hospira, Inc. regarding WARF's assertion of infringement of the '815 patent.  A1612-37.  This was the first time Washington University learned that its co-owned patent had been listed in the Orange Book and asserted in litigation.  A418-19, A438-39.  Washington University began to suspect that

---

[5] http://www.fda.gov/Drugs/InformationOnDrugs/ucm129662.htm.

WARF had undervalued the '815 patent, initiated an investigation, and (through outside counsel) requested that WARF provide information that would be needed to confirm whether WARF had breached the parties' Agreement.  A418-19, A438-40; A1638-44.

Specifically, to assess WARF's relative value assignment, Washington University requested the patent numbers of the patents listed in the Abbott License, as well as the value allocations assigned to any Orange Book patents licensed to Abbott.  A1643-44.  WARF responded that the co-owned patent was "meaningless and largely irrelevant" compared to the WARF-owned compound patent (A1646-47)—even though WARF had concluded that the jointly owned patent covers the use for which Abbott's Zemplar is marketed and also was asserting the patent to block generic competition.  A1594; A518-668; A1918-22; A1941-56; A2027-28, 2031-48.

The parties began pre-litigation discussions and executed a standstill agreement that tolled the applicable statute of limitations as of April 9, 2013.  A1156-57.

WARF stonewalled on Washington University's request for nine months.  A1646-49.  When WARF finally produced documents to Washington University, it did so subject to strict confidentiality terms restricting who at Washington University could view the production.  A1651.  Yet WARF's production contained

only the parties' prior correspondence, which was not confidential as between the parties.  It contained none of the information Washington University needed to continue its investigation—in particular, it did not contain a copy of the Abbott License.  A1651-707.  This lawsuit followed.

### 8.    *The co-owned patent is one of the most valuable patents in the 1998 Abbott portfolio*

Washington University's damages expert has concluded that the jointly owned patent is one of the most valuable patents that WARF licensed to Abbott. A2140-42, A2172-75.  WARF's own actions confirm this.  Unlike nearly all WARF-owned patents licensed to Abbott, the '815 patent was listed in the Orange Book and asserted in litigation against generic manufacturers.  A1709-11; A518-668.  In fact, in four of those suits to block generic competition, the co-owned '815 patent was the *only* patent asserted.  A519; A593; A606; A636.  WARF's expert reports in the Hospira litigation established that the co-owned patent covers Zemplar's approved use and that the advantages of the patent contributed substantially to Zemplar's commercial success.  A1918-22; A1941-56; A2027-28, A2031-48; A1896-98.  ██████████████████████

██████████████████████████████████

██████████████████████  A1776, A1778; A1433-34; A1532-33; A1536-40.

The only other patents in the Abbott portfolio of similar value are the two WARF-owned patents to which WARF assigned a total relative value of 70%. A2181-82; A2103. In fact, the co-owned patent had elements of value even greater than those patents—including that the '815 patent expired about 1.5 years later than those other patents. A2187; A1530; A2104. The remaining patents in the 30% group contribute virtually nothing to Zemplar. A2106-09. Only four of those patents potentially relate to Zemplar, but they could likely be designed around and would not have been as important as the '815 patent. A2109; A2188.

Additionally, the co-owned patent is more valuable if it is licensed to Abbott on an exclusive basis, as Abbott pays a higher royalty on patents that are licensed exclusively. A799. WARF's position on whether the co-owned patent is licensed exclusively has shifted, coinciding with what would be more advantageous to WARF at the time. In 2010, WARF told Washington University that the co-owned patent was licensed exclusively. A1596-97. Beginning in 2012, WARF also repeatedly represented in litigation against generic competitors that the license is exclusive. A564; A580; A593; A619; A641; A652; A1721; A1772; A1797; A1827; A1855. WARF's licensing manager so testified in a deposition in one of those cases. A1442-43, A1474-79. But in this case—when it would be more advantageous to WARF if the patent is licensed non-exclusively—WARF has taken the position that the license is non-exclusive. WARF's licensing manager

testified in this case that a few days after his deposition in the previous case, he "realized" that the co-owned patent was licensed non-exclusively, but that he never corrected that deposition testimony.  A1443-45, A1479-80.

According to Washington University's damages expert, the fair relative value of the co-owned patent is between 29% and 33% of the value of the entire Abbott portfolio, instead of the 0.968% relative value that WARF assigned. A2181-88.

## B.    Proceedings Below

In December 2013, Washington University sued for breach of contract and breach of the implied covenant of good faith and fair dealing (the "contract claims").  A1.[6]  Washington University moved for partial summary judgment that (1) both the express terms of the parties' Agreement and the implied covenant of good faith and fair dealing obligated WARF to assign a fair relative value to the co-owned patent and distribute income accordingly and (2) Wisconsin's six-year statute of limitations for contract claims (Wis. Stat. § 893.43) does not bar Washington University's claims.  A259-61.  Washington University contended that, under well-established Wisconsin law, each underpayment by WARF was a separate breach accruing a new contract cause of action, and that Washington

---

[6] Washington University also brought a claim for breach of fiduciary duty. The district court granted summary judgment to WARF on that claim, and Washington University does not press that claim in this appeal.  A22-24.

21

University's claims for underpayments dating back to July 1, 2006, accrued within the limitations period. A283-85; A1092-94. Washington University also explained that it would show at trial that WARF is equitably estopped from asserting the statute of limitations as to *any* of Washington University's contract claims, but that Washington University was not seeking summary judgment on that theory because it would require deciding disputed facts. A283 n.6; A1092 n.6.

WARF cross-moved for summary judgment asserting, *inter alia*, that Washington University's claims are time barred. A93-96; A757-60. Washington University responded that (1) its contract claims for underpayments dating back to July 1, 2006, were brought within the limitations period and (2) there were material disputes of fact as to whether WARF's conduct should estop it from relying on the statute of limitations. A345-48; A1215-18.

The district court agreed with Washington University that the parties' Agreement and the implied covenant of good faith and fair dealing require "WARF to exercise its authority to assign relative values fairly and in good faith." A21. The district court thus granted Washington University's motion for partial summary judgment on this issue. A24.

The district court nevertheless granted summary judgment to WARF, ruling that all of Washington University's claims are time barred. A13-14. In doing so, it failed to apply the well-established Wisconsin periodic payments doctrine; it thus

held time barred even Washington University's claims based on underpayments in the period beginning six years before the parties' standstill agreement. The district court reasoned that Washington University's "claim for breach of contract is based on WARF's assignment of relative value in 1998, which governed all subsequent annual payments." A14. The court thus ruled that "the statute of limitations began to run in 1998, and WashU's breach of contract claim expired in 2004." A14.

The district court also rejected application of the equitable estoppel doctrine. It acknowledged that, under Wisconsin law, the doctrine of equitable estoppel may bar a party from asserting the statute of limitations as a defense. A15 (citing *State ex rel. Susedik v. Knutson*, 191 N.W.2d 23, 25 (Wis. 1971)). The court noted that, as early as 2001, Washington University could have performed "a reverse calculation to arrive at the royalty amount paid by Abbott." A20; *see* A17-18. The court thus believed that, even if WARF had engaged in unfair and misleading conduct, WARF's conduct did not preclude Washington University from learning the amount of Abbott's royalty payments or the relative value that WARF had assigned to the co-owned patent. A17-20. But the district court did not explain how merely knowing the amount of Abbott's royalty payments and the relative value that WARF assigned to the co-owned patent could have enabled Washington University to determine whether that value was fair as compared to the value of the other patents in the portfolio—particularly in light of WARF's concealment of key

facts and its refusal, when Washington University asked in 1998, to supply a copy of the Abbott License.

The district court also determined that Washington University "filed this lawsuit in 2013 based on the same information it had as of April 4, 2001," suggesting that WARF's misrepresentations "did not prevent WashU from timely filing suit." A18. But the district court did not account for the new information that Washington University learned in 2012 that seriously called into question whether WARF's payments had been unfairly low—i.e., that the co-owned patent was important enough to Abbott that it was listed in the Orange Book and was being asserted in litigation as a blocking patent.

## SUMMARY OF ARGUMENT

I.    The district court erroneously held that Washington University's contract claims are completely barred by the six-year statute of limitations. Under Wisconsin law, where a party has a continuing contractual obligation to make periodic payments to another party, a new claim for breach of contract accrues upon each improper periodic payment. This principle applies even if the reason for each underpayment traces back to a single event outside the limitations period. This periodic payments rule has been the law in Wisconsin for more than 100 years and is a well-established contract law principle across multiple jurisdictions. Because WARF had a continuing obligation to make periodic, separately

calculated payments to Washington University, WARF committed separate breaches of the Agreement each time it made an improper payment.

The district court's conclusion that Washington University's claims are based on a single total breach in 1998, when WARF assigned an improper relative value to the jointly owned patent, cannot be reconciled with this well-established law. As the Wisconsin Court of Appeals has made clear, the single decision on which the district court relied does not support the district court's conclusion. Thus, at a minimum, Washington University's contract claims are timely beginning six years before the parties' standstill agreement.

II.    Washington University also should have been allowed to show at trial that WARF is equitably estopped from asserting the statute of limitations even as to claims that were filed outside the limitations period. Washington University put forward extensive evidence that WARF wrongfully concealed information from Washington University that prevented Washington University from learning that WARF's payments were improper. The evidence of WARF's misrepresentations and of Washington University's reliance on them to its detriment should have precluded summary judgment.

Instead, the district court decided that despite WARF's misrepresentations, Washington University could have reverse-calculated to determine the amount of Abbott's royalty payments. But that rationale fundamentally misses the import of

25

Washington University's evidence of concealment. It is not that WARF's misrepresentations prevented Washington University from learning the total amount of revenue from Abbott, but rather that they precluded Washington University from obtaining information about the other patents in the Abbott License—information that was crucial for Washington University to assess whether WARF's payments to Washington University were too low.

The district court also resolved factual disputes and failed to view the evidence in the light most favorable to Washington University. The district court decided that (1) WARF's misrepresentations did not prevent Washington University from filing suit because Washington University purportedly filed suit in 2013 based on the same information it had in 2001; (2) even though WARF falsely told the PTO that Dr. Slatopolsky had assigned his interest in the invention to WARF, that misrepresentation was supposedly immaterial; and (3) WARF did not mislead Washington University when it stated its purported policy of valuing all non-compound patents equally. But viewed in the light most favorable to Washington University, the evidence in the record contradicted each of these apparent factual findings by the district court. Because material disputes of fact exist as to the elements of equitable estoppel, the district court should not have granted summary judgment.

## STANDARD OF REVIEW

This Court reviews the grant of summary judgment de novo, applying "the same test the district court should have used." *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 637 (3d Cir. 1993). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Whether the periodic payments doctrine applies is a legal question. *See Policemen's Annuity & Benefit Fund v. City of Milwaukee*, 630 N.W.2d 236, 240-43 (Wis. Ct. App. 2001).

An equitable estoppel claim is amenable to summary judgment only if there is no genuine dispute of material fact concerning the elements of estoppel. *Affordable Erecting, Inc. v. Neosho Trompler, Inc.*, 715 N.W.2d 620, 625 (Wis. 2006). In determining whether disputed issues of material fact exist, Washington University is entitled to have all inferences drawn in its favor and all evidence viewed in the light most favorable to Washington University. *Josey*, 996 F.2d at 637. "Summary judgment is precluded if a disputed fact exists which might affect the outcome of the suit under the controlling substantive law." *Id.*

## ARGUMENT

I. **UNDER WISCONSIN'S PERIODIC PAYMENTS DOCTRINE, WASHINGTON UNIVERSITY'S CLAIMS ARE TIMELY BEGINNING SIX YEARS BEFORE THE PARTIES' TOLLING AGREEMENT**

### A. Under Wisconsin Law, Where, As Here, One Party Owes A Contractual Duty To Make Periodic Payments, A New Claim For Breach Accrues With Each Underpayment

Under the firmly rooted periodic payments doctrine, where a party has a continuing contractual obligation to make periodic payments to another party, a new claim for breach of contract accrues upon each improper periodic payment. This rule applies even if the reason for each new breach traces back to a single event outside the limitations period, such as an original misinterpretation or dispute about the meaning of a contract. In refusing to apply this principle, the district court disregarded a doctrine that has been the law in Wisconsin for well over 100 years and is deeply ingrained in contract law across jurisdictions.

In Wisconsin, the periodic payments rule—also referred to as the continuing violation rule—dates back at least to the Supreme Court of Wisconsin's 1881 decision in *Butler v. Kirby*, 10 N.W. 373 (Wis. 1881). In *Butler*, the contract dispute centered on how much the defendant employer promised in 1866 to pay the plaintiff employee. *Id.* at 374. The employee contended that in 1866 the employer promised him $48 per month, but the employer insisted the employee was promised only $40 per month. *Id.* From 1866 until his employment ended in

1876, the employee was paid $40 per month.  *Id.*  The employee did not file suit until 1878, twelve years after the alleged promise of $48 per month.  *Id.*  The Wisconsin Supreme Court held that because the plaintiff's "wages became due at the end of each month, . . . the balance due on each month's wages remained as a distinct debt."  *Id.*  The statute of limitations barred recovery for "so much as accrued more than six years prior to a suit therefor."  *Id.* at 375.  But with respect to the monthly wages within the six-year period before suit was filed, the plaintiff was "entitled to recover, and only entitled to recover, eight dollars per month for each month's service."  *Id.*

Wisconsin courts have applied this principle in a multitude of cases, consistently holding that contract claims alleging a continuing violation can be maintained for the six-year period before filing suit.  In *Segall v. Hurwitz*, the Wisconsin Court of Appeals reversed a judgment that contract claims were time-barred, even though the plaintiff knew of the contractual violations more than six years before the action was commenced.  339 N.W.2d 333, 342-43 (Wis. Ct. App. 1983).  *Segall* involved contract claims alleging a violation of a covenant not to compete and an agreement not to use a business name.  *Id.*  The court explained that the contractual covenants "imposed continuing duties of performance," and contracts with continuing duties are capable of a series of "partial" breaches.  *Id.* at 343.  "Accordingly, if the promisor has a continuing duty to perform, generally a

new claim accrues for each separate breach," and the "injured party may assert a claim for damages from the date of the first breach within the period of limitation." *Id.* (citing *Butler*, 10 N.W. at 375).

In *Jensen v. Janesville Sand & Gravel Co.*, the court held that even the complete repudiation of a contractual obligation outside the limitations period did not preclude suing to recover for breaches of the payments due within the limitations period. 415 N.W.2d 559, 561-62 (Wis. Ct. App. 1987). In *Jensen*, the defendant agreed in 1970 to pay the plaintiff an annual pension upon his retirement, which it did through 1974. *Id.* at 561. In 1976, the defendant repudiated the contract, informing the plaintiff "that his pension had been terminated, there was no intention to restore the pension, he was completely removed from the pension plan, and the board had refused to restore his payments." *Id.* The plaintiff sued in 1983—more than six years after the repudiation—and sought damages dating back to 1979. *Id.*

Relying on the Restatement (Second) of Contracts, the court held that "the company's repudiation of its obligation to pay Jensen an annual pension did not result in a total breach requiring him to commence this action within six years from the date of repudiation." *Id.* at 562 (citing Restatement (Second) of Contracts § 243(3)). And because the claimed damages period began with 1979, less than six years from when suit was brought, the claim was not barred by the statute of

limitations.  *Id.*  The court explained that, "[b]ecause the right to receive periodic payments under a pension is a continuing right, the statute of limitations runs from the time when an installment is due under the pension."  *Id.* at 561; *see also Md. Staffing Servs., Inc. v. Manpower, Inc.*, 936 F. Supp. 1494, 1508 (E.D. Wis. 1996) ("[B]ecause the complaint alleges a series of breaches of the contract, the plaintiffs may assert a claim for damages from the date of the first breach within the period of limitation."); *Welter v. City of Milwaukee*, 571 N.W.2d 459, 465 (Wis. Ct. App. 1997) ("Receipt of a pension installment payment that is less than that required by contract is a separate breach of that contract.  Accordingly, the [plaintiffs] have six years to sue on any pension installment that was less than it should have been." (citation omitted)).

In *Noonan v. Northwestern Mutual Life Insurance Co.*, the court again made clear that the periodic payments principle applies even if a single event outside the limitations period gave rise to the improper payments.  687 N.W.2d 254 (Wis. Ct. App. 2004).   In *Noonan*, the plaintiffs owned Northwestern annuity policies entitling them to annual dividends.  *Id.* at 256-57.  In 1985, Northwestern changed the way it calculated annuity payments.  *Id.* at 257.  In 2000, the plaintiffs learned of this change and sued, alleging that the payments had been miscalculated since 1985.  *Id.*  The court rejected Northwestern's argument that "any breach occurred in 1985 when the change was made."  *Id.* at 262.  Instead, the court held that "if

Northwestern breached the contracts, a breach occurred every year" an underpayment was made. *Id.* Thus, "the continuing violation rule allows an action for Northwestern's breach of the contracts over the six years prior to filing of this action." *Id.*; *see also Policemen's Annuity*, 630 N.W.2d at 240-43 (concluding that suit could be brought for six years of improper pension payments to retirees even though the improper payments were caused by the city's failure to contribute to a pension fund outside the limitations period).

The Wisconsin rule that a separate breach occurs with each improper payment is a well-accepted principle in contract law across jurisdictions. Corbin on Contracts explains that "[i]f a contract provides for the payment of money in installments, an action will lie for each installment as it falls due." 10-53 Corbin on Contracts § 53.6. Such installment contracts, as well as other contracts that require continuing performance, "are capable of a series of 'partial' breaches," and "[f]or each 'partial' breach a separate action is maintainable." *Id.* § 53.14. Thus, the "standard rule for the time in which the statute of limitations begins to run in an installment contract" is that the "limitation period on each missed monthly payment under the contract in question begins to run separately." *Id.* § 53.6. Corbin collects numerous decisions from courts across the nation holding that the limitations period for claims based on a contract with a continuing obligation begins running at the time of each successive breach; actions for later breaches

within the limitations period may be maintained even though earlier breaches are time barred. *Id.* §§ 53.6, 53.14; *see also Lutz v. Chesapeake Appalachia, LLC*, 717 F.3d 459, 468-70 (6th Cir. 2013) (surveying decisions).

Similarly, according to Williston on Contracts, each incorrect or missed payment under an installment contract is a separate breach. Williston explains that if "money is payable in installments, . . . [a] separate cause of action arises on each installment, and the statute of limitations runs separately against each." 31 Williston on Contracts § 79:17 (4th ed.). The only exception articulated in Williston is "where the creditor has a right to accelerate payments on default and does so." *Id.*

The Restatement explains the same principles: "It is well established that if those duties of the party in breach at the time of the breach are simply to pay money in installments, not related to one another in some way, . . . then a breach as to any number less than the whole of such installments gives rise to a claim merely for damages for partial breach." Restatement (Second) of Contracts § 243 cmt. c (1981) (discussing Restatement § 243(3), the provision quoted with approval in *Jensen*, 415 N.W.2d at 562). Thus, when a payment is missed or made improperly, the party to whom the payments are owed can sue for the missed or improper payments, but it cannot immediately sue for payments that have not yet come due

under the contract.  *See id.* cmt. c and Illustrations 4-5; *see also id.* § 236 (distinguishing between total and partial breach).

Applying this longstanding principle, Washington University brought timely contract claims for underpayments beginning six years before the parties' April 2013 standstill agreement.  WARF had a continuing contractual obligation to make annual payments to Washington University.  A297 (Section 5.B.).  Each payment was separately calculated, based on the royalties received during each preceding twelve-month period.  A297 (Section 5.B.).  As a payment came due each year, a new obligation arose to make the new payment, and each such obligation was capable of a separate breach.  *See, e.g.*, *Jensen*, 415 N.W.2d at 561-62.  WARF thus committed separate breaches of the Agreement each year it made annual royalty payments less than what was due.  Each time WARF committed such a breach, a new claim for contract damages arose.  Washington University's claims for the breaches beginning six years before the standstill agreement are therefore timely.

## B.    The District Court's Conclusion Is Contrary To Governing Law

The district court nevertheless held the claims time-barred because it believed that Washington University's claims "are based on a single total breach" from WARF's assignment of relative value in 1998.  A14.  It concluded that "the statute of limitations began to run in 1998, and WashU's breach of contract claim

expired in 2004."    A14.    The district court thus held that for Washington University to obtain the payments to which it was entitled under the Agreement, Washington University had to sue within six years of 1998 for all future payments. That conclusion cannot be reconciled with Wisconsin law.

As explained, numerous Wisconsin decisions (including from the Wisconsin Supreme Court) hold that a new claim for breach of contract accrues upon each improper periodic payment *even if the reason for each underpayment traces back to a single event outside the limitations period*.  *Butler*, 10 N.W. at 374-75; *Segall*, 339 N.W.2d at 342-43; *Jensen*, 415 N.W.2d at 561-62; *Policemen's Annuity*, 630 N.W.2d at 240-43; *Noonan*, 687 N.W.2d at 262.   Thus, even assuming that the 1998 undervaluation "governed all subsequent annual payments"—which, as shown below, it did not—that does not mean it constituted a "single total breach" that triggered the limitations period for seeking damages for all future payments. A14.

Because Washington University's right under the Agreement was to receive payments in installments, Washington University did not have to (and in fact could not) sue within six years of 1998 for all of its future damages based on some claim of "single total breach."   *See* Williston § 79:17 ("If, by its terms, the money is payable in installments, then no breach, however serious, as to earlier installments can resolve the creditor's right into a single claim for damages on the entire

contract."); *Jensen*, 415 N.W.2d at 562 (repudiation of obligation to make annual payments is not a total breach); Restatement § 243 cmt. c (same). The Agreement contained no acceleration clause or other provision under which a single underpayment would have made all payments immediately due. *See* Restatement § 243 cmt. d; Williston § 79:17. Rather, WARF had no obligation to make any payment for a given year unless and until it received royalties over the course of that year. A294, A297 (Sections 1.F., 5.B.).

In its recitation of its view of the law, the district court quoted *Segall*'s statement that a "continuing contract is capable not only of a series of partial breaches but also of a single total breach by repudiation or a material failure of performance." A14 (quoting *Segall*, 339 N.W.2d at 343). But *Jensen* explained that *Segall*'s "total breach" discussion does not apply where, as here, the continuing contractual obligation is to make periodic payments. *Jensen*, 415 N.W.2d at 561-62. Even a complete repudiation of an obligation to make payments in installments is not a total breach. *Id.* at 562.[7]

---

[7] The district court erroneously believed that "WashU admits that its claims are based on a single total breach from WARF's alleged 'failure to properly value the '815 Patent in the first place' in 1998." A14 (quoting A342; A1212). To be sure, Washington University contends that WARF failed "to properly value the '815 patent in the first place." A342; A1212. But Washington University never suggested that that undervaluation constituted a "single total breach." Rather, Washington University consistently has contended that the improper valuation in 1998 led to each payment being a separate partial breach. A40.

That each underpayment is a separate breach is bolstered here by the fact that each payment had to be independently calculated:  calculation of Washington University's share of the royalties depended not just on the relative valuation but also on multiple factors that *changed* each year.  The amount of each year's royalty payment depended on Abbott's payments over the course of the preceding year (which was driven by Abbott's revenue from its sales of Zemplar) as well as the amount WARF was entitled to deduct for its expenses for the preceding year.  A294-96 (Sections 1.F, 3.A.(iii)).  Thus, each annual payment here is at least as separate as the monthly salary payments in *Butler* or the annual pension payments in *Jensen*, which were fixed by an act outside the limitations period.  *Butler*, 10 N.W. at 374; *Jensen*, 415 N.W.2d at 561.  Yet in both cases, each underpayment was held to be a separate breach triggering a new six-year limitations period.  *Butler*, 10 N.W. at 375; *Jensen*, 415 N.W.2d at 562.

Furthermore, and in any event, the district court erred in implicitly concluding that WARF had no obligation to update the co-owned patent's relative value over time—especially given the district court's correct conclusion that the duty of good faith and fair dealing required "WARF to exercise its authority to assign relative values fairly and in good faith."  A21.  As Washington University's expert explained, the usual practice with inter-institutional agreements is to reevaluate the relative values of patents in a portfolio in light of significant events.

A2075.  For example, when a patent in the portfolio expires, it is common practice to redistribute its relative value to the other patents in the portfolio.  A2075-76.  In fact, WARF performed a reallocation in 1999 with respect to its solely owned patents after it abandoned a patent application that had been included in the 30% group.  *Supra*, pp. 12-13 & n.2.  WARF's expert also acknowledged that institutions will cure an improper value assignment in response to "a specific challenge from a stakeholder."  A1520.  Washington University advanced precisely such a challenge, yet WARF never revalued the relative value of the jointly owned patent.  A2075-76, A2093-94; A1709-11; A2187; A1530.  Thus, even if each periodic payment were not a breach (and it was), WARF breached the contract within the six years preceding the tolling agreement by not updating the co-owned patent's relative value.

Finally, the only decision relied on by the district court for the proposition that there was a "single total breach" does not support that conclusion.  A14 (citing *Messner Manor Assocs. v. Wis. Hous. & Econ. Dev. Auth.*, 555 N.W.2d 156 (Wis. Ct. App. 1996)).  In *Messner Manor*, the plaintiff alleged that the defendant breached the parties' agreement by incorrectly adjusting the interest rate to a higher rate.  555 N.W.2d at 158-59.  The breach of contract action was filed more than six years after the allegedly incorrect interest-rate adjustment, but the plaintiff contended that its own interest payments over the six-year period before filing suit

constituted separate breaches and thus the claims based on those payments should not be time barred.  *Id.* at 159.

In affirming dismissal of the suit, the Wisconsin Court of Appeals held there was never any breach, not that the claims were time-barred.  The court explained that the parties agreed to the higher interest rate "and that payments of the note at that rate did not constitute breaches of the agreement."  *Id.* at 160; *see id.* at 159 ("We, however, are not persuaded that the adjustment of the annual percentage rate, incorrect or not, constituted a breach."); *id.* at 160 ("The evidence establishes that both parties understood the mortgage rate to be 6.75% and not some lower figure.").  Although the court concluded its discussion by stating, "Accordingly, Messner Manor's claim for excessive interest rate is time barred," *id.* at 160, the court's analysis focused solely on whether there was any breach at all, not on whether there was a breach within the limitations period.  *Id.* at 158-60.

As the Wisconsin Court of Appeals later clarified, "*Messner Manor* contains no meaningful discussion of the application of the contract statute of limitations to an arguably ongoing series of individual breaches relating to the same agreement." *Jahn Transfer, Inc. v. Horizon (H&S) Freightways, Inc.*, 819 N.W.2d 563, 2012 Wisc. App. LEXIS 484, at *4-7 (Wis. Ct. App. 2012) (unpublished but citable for its persuasive value, *see* Wis. Stat. § 809.23(3)(b)).  The court "admit[ted] that [its] opinion [in *Messner Manor*] states that the claim was time barred, but that

statement is an obvious drafting error." *Id.* at \*6 (citation omitted). The court explained that *Messner Manor* "affirmed dismissal of the breach of contract claim on the basis that there was no breach," not that the claim was time barred. *Id.* at \*5. Despite this clarification from the Wisconsin Court of Appeals, the district court here relied on *Messner Manor* to hold Washington University's claims time-barred, without making any attempt to reconcile that conclusion with *Jahn* or the many Wisconsin decisions applying the periodic payments doctrine.

\*   \*   \*

For all these reasons, Washington University's contract claims for damages beginning six years prior to the parties' standstill agreement are timely. Summary judgment to WARF on these claims should be reversed and Washington University's motion for partial summary judgment on the timeliness of these claims should be granted, and the case remanded.

## II. MATERIAL DISPUTES OF FACT EXIST AS TO WHETHER WARF'S MISCONDUCT EQUITABLY ESTOPS IT FROM ASSERTING THE STATUTE OF LIMITATIONS DEFENSE FOR CLAIMS FILED OUTSIDE THE LIMITATIONS PERIOD

As to the contract claims outside the limitations period, Washington University should have been permitted to show at trial that WARF is equitably estopped from relying on the statute of limitations. Washington University put forward more than enough evidence for a reasonable factfinder to find for Washington University on equitable estoppel. In concluding to the contrary, the

district court misunderstood the significance of WARF's concealment, failed to view the evidence in the light most favorable to Washington University, and also improperly resolved disputes as to some of the facts.

### A. Washington University Put Forward More Than Enough Evidence To Warrant A Trial On Equitable Estoppel

Equitable estoppel "suspends the running of the statute of limitations during any period in which the defendant took active steps to prevent the plaintiff from suing." *Barry Aviation Inc. v. Land O'Lakes Municipal Airport Comm'n*, 377 F.3d 682, 689 (7th Cir. 2004) (applying Wisconsin law). The elements of equitable estoppel are: (1) the defendant engaged in fraudulent or wrongful conduct, (2) the plaintiff reasonably relied on the defendant's representation or acts, and (3) as a result of the reliance the plaintiff failed to sue within the limitations period. *See Affordable Erecting*, 715 N.W.2d at 628; *Knutson*, 191 N.W.2d at 25; *Policemen's Annuity*, 630 N.W.2d at 243. "Actual fraud, in a technical sense, is not required" for a party to be estopped from invoking the statute of limitations as a defense. *Knutson*, 191 N.W.2d at 26. Among the conduct that stops the running of the statute of limitations is "the defendants' concealing evidence from the plaintiff that he needed in order to determine that he had a claim." *Barry Aviation*, 377 F.3d at 689. "Affirmative effort to prevent the plaintiff from suing—above the defendant's mere denial of liability—is what is required." *Id.*

41

Once such inherently factual disputes about the elements of equitable estoppel are resolved, the ultimate test for application of estoppel is "whether the conduct and representations of the defendant were so unfair and misleading as to outbalance the public's interest in setting a limitation on bringing the actions." *Policemen's Annuity*, 630 N.W.2d at 243 (brackets omitted) (quoting *Hester v. Williams*, 345 N.W.2d 426, 431 (Wis. 1984)); *see Elliott v. Gen. Cas. Co. of Wis.*, 807 N.W.2d 33, 2011 WL 5120370, at *9 (Wis. Ct. App. 2011) (unpublished but citable for its persuasive value).  But if factual disputes exist about the elements of estoppel, "then summary judgment is improper." *Affordable Erecting*, 715 N.W.2d at 625.

Here, there was more than enough evidence to show the existence of such factual disputes.  Washington University put forward sufficient evidence to support a finding at trial that, throughout the entire course of the parties' relationship, WARF engaged in wrongful conduct, including concealing key information from Washington University that it needed to determine that it had a claim against WARF.

The evidence showed that WARF's inequitable conduct began when WARF was applying for the '815 patent.  Although Dr. Slatopolsky worked for Washington University, WARF attempted in January 1996 to get Dr. Slatopolsky to assign all of his interest in the co-invention to WARF.  A1278-79.  WARF did

so, even though it was well aware that Dr. Slatopolsky already had assigned his interest to Washington University; indeed, the Agreement itself, entered only several months before on November 1, 1995, expressly so stated. A297 (Section 4.B.). But when WARF submitted Dr. Slatopolsky's assignment to Washington University to the PTO for recordation, WARF attached it to an official PTO form on which WARF falsely stated that Dr. Slatopolsky had assigned his interest to *WARF*. A1562. The PTO expressly notified WARF that it had been recorded as the sole assignee and instructed WARF—in all capital letters—to "REVIEW ALL INFORMATION CONTAINED ON THIS NOTICE" and contact the PTO "IF YOU SHOULD FIND ANY ERRORS." A2082. WARF did not correct the error until 2012, after Washington University demanded that it do so. A2082.

WARF also prevented Washington University from being able to investigate the fairness of the relative valuation that WARF had assigned to the co-owned patent. In 1998, in response to Washington University's request for access to the Abbott License agreement, WARF denied access on the false pretense that the Abbott License was confidential and could not be shared with Washington University. A171. Due to WARF's concealment and misrepresentation, Washington University had no way of looking into the relative value of the co-owned patent. Washington University did not know—and had no way of knowing,

unless told by WARF—which other patents were covered by the license, and it thus could not compare its jointly owned patent to the others. A2092; A1295-96; A433-36. This fact alone should have been enough to defeat summary judgment and proceed to trial on equitable estoppel. *See Barry Aviation*, 377 F.3d at 689.

But there was much more. In 2001, WARF misrepresented in a letter to Washington University that its valuation of the patents covered by the Abbott License was in accordance with WARF's "regular practice" of allocating 70% to the patents that cover the drug compound itself and its "policy to allocate evenly among" the remaining patents. A1591; A2097-2102. But as Washington University has learned through discovery in this suit, WARF had no such practice or policy. A2098-2102. Indeed, one of the two patents that WARF included in the 70% group was a WARF-owned method-of-use patent, not a compound patent. A2100-01. ████████████████████████████████████████

████████████████████████████████████████

███████████████

In that same 2001 letter to Washington University, WARF misleadingly implied that it was "difficult if not impossible for WARF to determine whether or not the [co-owned] patent is being used" by Abbott. A1591. In fact, however, WARF had already concluded internally in 1996 and 1998 that the co-owned patent provides "additional protection" for and "directly supports" Abbott's

Zemplar—conclusions that WARF never shared with Washington University. A1006; A1010.

WARF also concealed its renewed determination in 2008 that the jointly owned patent protected Abbott's Zemplar. In 2008, WARF was trying to determine whether any other licensed patents would provide protection for Abbott's Zemplar after expiration of the compound patent. A1460-62. WARF examined the co-owned '815 patent and concluded it was the only licensed patent that would continue covering Zemplar's use after expiration of the compound patent. A2092-93; A1594; A1461-63, 1466-68. WARF determined that the co-owned patent covered "exactly the application and population Abbott targets and sells Zemplar for." A1594. But WARF never told Washington University about that conclusion. A2093; A1471-72.

In 2011, Abbott listed the jointly owned patent in the FDA's Orange Book, indicating that Abbott believed it covers the approved method of use for Zemplar. A1709-11. WARF knew Abbott was listing the patent in the Orange Book. A1387-88. But WARF never told Washington University about it. A2093-94.

Then in 2012, WARF began asserting the co-owned patent in litigation against eight generic competitors, seeking to block generic competition for Zemplar. A2109-10; A518-668. WARF never told Washington University about this either. Had WARF not concealed this crucial information from Washington

University, this information would have immediately indicated to Washington University that the co-owned patent was *far* more valuable than the relative value WARF had assigned to it.  In fact, learning of the litigation against Hospira is what suggested to Washington University that it needed to investigate.  A418-19, A438-50.

What is more, WARF (falsely) represented in that litigation that WARF was the patent's sole owner.  A2084-86, 2109-11; A1280-81; A1719; A1746.  Had WARF not done so—or had it filed the correct assignment document with the PTO years earlier—Washington University would have learned of the suits earlier.  A2082; A1280-81.

As late as 2013, WARF was telling Washington University that the co-owned patent was "meaningless and largely irrelevant" compared to the WARF-owned compound patent.  A1646-47.  WARF said this even though:  (1) it had concluded that the jointly owned patent covers Zemplar's approved use, (2) it was asserting the patent in infringement litigation to block competition, and (3) shortly thereafter, it filed expert reports in the infringement litigation explaining that the advantages of the '815 patent contributed substantially to Zemplar's commercial success.  A1594; A516-668; A1918-22; A1941-56; A2027-28, 2031-48; A1896-98.

Washington University reasonably relied on WARF's wrongful conduct and misrepresentations. Washington University accepted WARF's assertions that it could not disclose the Abbott License and that its assignment of relative value to the co-owned patent was according to WARF's practice and policy. A417-19, A434-36, A438-39; A171; A1591-92; A2089-90, A2097-102. Washington University could not have known the falsity of those assertions because such knowledge was within WARF's control. A171; A2089-90; A434-36. Additionally, WARF's expert admitted that Washington University had no reason to suspect inaccuracies in WARF's 2001 letter explaining its relative value assignment. A1241, A1271. Washington University also entrusted WARF to file accurate representations with the PTO and in litigation against generic competitors, as it was WARF's responsibility under the Agreement to pursue patent protection and to engage in infringement litigation. A295, A298-99 (Sections 3.B., 9.A.).

The evidence also showed that WARF's misrepresentations prevented Washington University from filing suit within the limitations period. WARF's refusal to provide Washington University access to the Abbott License on the false pretense of confidentiality prevented Washington University from determining for itself the value of the jointly owned patent relative to the other patents in the portfolio. A2092; A1295-96; A433-36. And WARF's recordation of inaccurate assignment information with the PTO and its false ownership assertions in

litigation prevented Washington University from learning that the co-owned patent actually was so valuable to Abbott's Zemplar that it was being used as a blocking patent to preclude generic competition.  A1280-81.  Once Washington University learned in 2012 about the importance of the co-owned patent, it promptly negotiated a standstill agreement to toll the running of the statute of limitations, and it filed suit in 2013.  A1156-57.

In short, the record evidence shows that WARF repeatedly concealed vital information that prevented Washington University from learning that WARF had dramatically undervalued the co-owned patent and was paying Washington University far less than it was due.  Regardless of whether this extensive evidence of WARF's wrongful conduct ultimately will carry the day at trial, it is more than enough to go to trial.  It should have precluded summary judgment on the timeliness of Washington University's claims.  *See Barry Aviation*, 377 F.3d at 689; *Policemen's Annuity*, 630 N.W.2d at 243-44.

### B.    The District Court Misunderstood The Significance Of WARF's Concealment And Failed To View The Evidence In The Light Most Favorable To Washington University

#### 1.    *The district court fundamentally misunderstood the significance of the evidence WARF concealed*

In nevertheless granting summary judgment, the district court wrongly dismissed many of these instances of misrepresentation or concealment.  It concluded that, even if WARF's conduct was "problematic," it did not prevent

Washington University from learning of the amount of Abbott's royalty payments. According to the district court, Washington University could have performed "a reverse calculation to arrive at the royalty amount paid by Abbott." A20; *see also* A18 (Washington University "was advised to reverse-calculate to determine the amount WARF received from Abbott . . . . WashU does not suggest it ever attempted to reverse-calculate . . . ."); A18 ("WARF provided the basis for its calculation and encouraged WashU to reverse calculate."). In essence, the district court concluded that Washington University could have calculated the total amount of royalties that WARF received from Abbott, and thus could have known what proportion of those royalties Washington University was receiving.

But that rationale fundamentally misses what it is that WARF concealed: information about the *WARF-owned patents* in the Abbott License and the worth of the co-owned patent *in comparison to* those WARF-owned patents. By falsely denying Washington University access to the Abbott License and by misrepresenting its practices and procedures in valuing patents, WARF prevented Washington University from determining for itself whether WARF's annual payments to Washington University fairly reflected the relative worth of the jointly owned patent. A433-36.

Knowledge of the other patents covered by the license was crucial to Washington University's ability to know it had a claim. Without the license,

Washington University had no way of knowing which patents were covered by the license and thus could not evaluate how the jointly owned patent compared to the other patents licensed in the portfolio. A2092; A1295-96; A433-36. Without the license, Washington University also was unable to learn that WARF had classified a method-of-treatment patent as a Licensed Patent (in the 70% group)—contrary to WARF's representation that only compound patents were classified as Licensed Patents. A2100-01. Had Washington University been able to see the Abbott License, it could have learned that the co-owned patent (which also was a method-of-treatment patent) was eligible for inclusion in the Licensed Patent group. That is, access to the Abbott License would have allowed Washington University to determine that WARF had unfairly favored the WARF-owned patents over the co-owned patent and was underpaying Washington University. Indeed, the fact that WARF stonewalled for nine months in 2012 despite pressure from Washington University to identify the other patents licensed to Abbott (A1645-1707) suggests that WARF understood the significance of this information to Washington University's ability to file suit.

Contrary to the district court's conclusion, merely reverse calculating to determine "the royalty amount paid by Abbott" (A20) would not have informed Washington University about any of this. As one of Washington University's in-house counsel testified: "The missing information is the appropriateness of the

50

relative valuation.  But it's true that one could have done the arithmetic to figure out what WARF had been paid by Abbott, but what was not possible was to determine whether what it was paying Wash U was proper because we had no way to assess the relative valuation of the patent."  A434.

The district court also reasoned that "WashU knew the relative value WARF assigned to the '815 Patent by April 4, 2001, over two years prior to the expiration of the statute of limitations for contract actions."  A18.  But merely knowing what relative value WARF assigned to the co-owned patent is not the same as having information that would have enabled Washington University to evaluate for itself the *accuracy* of that relative value.  It is the ability to determine the true relative worth that WARF kept from Washington University and that precluded Washington University from learning it had a claim against WARF.

> ### 2.    *The district court resolved factual disputes and failed to view the evidence in the light most favorable to Washington University*

It is axiomatic that at summary judgment, the non-movant is entitled to have all inferences drawn in its favor and all evidence viewed in the light most favorable to it.  *Josey*, 996 F.2d at 637.  Rather than view the evidence this way, the district court cherry-picked certain of WARF's misrepresentations and tried to explain them away as accurate or inconsequential.  In so doing, the district court

disregarded evidence contradicting its determinations and therefore improperly resolved disputed issues of fact in WARF's favor.

***First***, the district court determined that Washington University "filed this lawsuit in 2013 based on the same information it had as of April 4, 2001"—i.e., the date that WARF explained its valuation of the co-owned patent—and thus "agree[d] with WARF that its actions, inactions, or representations did not prevent WashU from timely filing suit." A18. But evidence in the record disputes that apparent factual finding.

Washington University filed suit after learning key information in 2012 about the true relative value of the co-owned patent. Specifically, Washington University learned that WARF was asserting the co-owned patent in litigation against eight generic drug manufacturers, seeking to block generic competition with Abbott's Zemplar. Washington University did not learn of this litigation from WARF; rather, it received a subpoena from Hospira, a defendant in one of the suits. A418-19, A438-39; A1612-37. This was the first time Washington University learned that the co-owned patent was being asserted in litigation to block generic competition against Zemplar. A418-19, A438-39. This information also led to Washington University's learning that the co-owned patent was one of only three patents listed in the FDA's Orange Book as covering Zemplar. A438-39. All of this information—newly learned in 2012—revealed to Washington

University that the co-owned patent was likely worth far more than the relative value that WARF had assigned to it and that WARF's payments to Washington University were likely far too low.  A418-19, A438-39.  It was knowledge of this new information that led Washington University to file suit.

It is true that at the time Washington University filed suit, it did not have a copy of the Abbott License and still did not have a list of the other patents included in that license.  Washington University pressed WARF to provide this information after it learned about WARF's litigation against generic competitors.  A418-19, A438-50; A1639-44.  WARF's persistent refusal to identify the other licensed patents—even under terms requiring Washington University to keep the information confidential—signaled that WARF was hiding information that would reveal that its relative valuation was improper.  A1645-1707.  Washington University therefore sued and gained access to this information through discovery in this lawsuit.  But contrary to the district court's conclusion, the fact that Washington University did not have a complete picture of the patents in the Abbott License when it filed suit does not mean that Washington University "filed this lawsuit in 2013 based on the same information it had as of April 4, 2001."  A18.

*Second*, the district court also decided that WARF's filing with the PTO—in which it incorrectly represented that Dr. Slatopolsky had assigned his interest in the co-invention to WARF—was immaterial.  According to the district court,

WARF submitted "an inaccurate cover sheet" that was not "of any consequence when, indeed, the assignment document itself was correct."  A19.  But the PTO's actions demonstrate that WARF's misstatement *was* material:  the PTO recorded Dr. Slatopolsky's assignment as having been to *WARF*, and WARF did not correct the PTO's records until pressed by Washington University.  A2081-82.

WARF's inaccurate assignment recordation prevented Washington University from receiving notice that the co-owned patent was listed in the FDA's Orange Book and could potentially block generic competition for Abbott's Zemplar.  Whenever a generic drug manufacturer files with the FDA an abbreviated new drug application ("ANDA") to market a generic drug and certifies that a patent listed in the FDA's Orange Book is invalid or will not be infringed, the generic manufacturer must notify "each owner of the patent."  21 U.S.C. § 355(j)(2)(B)(iii)(I).  Providing such notice often triggers litigation between the patent owner and the generic manufacturer regarding whether the patent blocks the generic drug's market entry.  In fact, WARF's receipt of such notifications is what led WARF to assert the co-owned patent in litigation against generic manufacturers.  A568-569; A583; A596; A610; A623; A642; A657.  But because WARF had misstated the ownership of the co-owned patent in its assignment recordation with the PTO, there was no reason for the generic manufacturers to know that Washington University was an "owner of the patent" entitled to

notification of the ANDA.  21 U.S.C. § 355(j)(2)(B)(iii)(I).  Had WARF accurately recorded the assignment with the PTO, Washington University would have received notice from generic manufacturers that the co-owned patent was an Orange Book patent that could potentially block competition, and that it was therefore far more valuable than WARF represented.

In addition, the district court failed to view WARF's misrepresentation to the PTO in the broader context of WARF's repeated practice of misrepresenting that it was the sole owner of the '815 patent.  In patent infringement suits against eight generic drug manufacturers, WARF never identified Washington University as a co-owner of the '815 patent but instead repeatedly represented to generic competitors and the district court that WARF was the sole owner.  A2084-86, A2109-11; A1280-81; A1719; A1746.  WARF's pattern of representing itself as the sole owner is a significant part of what kept Washington University from learning that the co-owned patent was being asserted in litigation as a key blocking patent.  A2082; A1280-81.

The district court reasoned that even if WARF's misrepresentation to the PTO prevented Washington University from learning of the Zemplar infringement suits, that does not matter because the "Agreement authorizes WARF to litigate without giving notice to WashU."  A19.  But again the district court misunderstood the import of the evidence.    The point is not merely that WARF's

misrepresentations prevented Washington University from learning about the litigations; rather, by keeping Washington University uninformed about the litigations, WARF continued to keep Washington University in the dark about the true worth of the co-owned patent.  A2082; A1280-81.

*Third*, the district court improperly determined at summary judgment that another of WARF's statements was not misleading.  In 2001, WARF told Washington University that its "policy" was to value all of the Ancillary Patents evenly "because, in many cases, it is difficult if not impossible for WARF to determine whether or not the patent is being used by the Licensee at this time."  A1591.  Washington University explained that WARF's statement was misleading because, at the time, WARF already had determined that the co-owned patent "directly supports" Abbott's Zemplar.  A1010; *see* A1006.  The district court "[did] not agree" that WARF's statement was misleading.  A20.  Instead, the district court concluded that WARF's statement was a "general explanation" of WARF's policy.  A20.

But WARF's statement was misleading—especially when viewed in the light most favorable to Washington University, as it must be when considering WARF's summary judgment motion.  WARF knew that Washington University was trying to assess the worth of the co-owned patent:  Washington University had requested access to the Abbott License and had requested information about how

WARF determined the relative value of the co-owned patent.  A171; A1591-92. WARF also knew that the co-owned patent directly supported Zemplar.  A1006; A1010.  Yet rather than acknowledge this to Washington University, WARF essentially told Washington University that the co-owned patent was no different from other patents as to which it was "difficult if not impossible for WARF to determine whether or not the patent is being used by" Abbott.  A1591.

In any event, and as the district court did not dispute, WARF's representation that its "policy" was to allocate evenly among the non-compound patents was simply false.  A2098-2102.  Indeed, WARF assigned one of its own method-of-treatment patents to the group of Licensed Patents—i.e., the group that was assigned 70% value.  A2100-01.  WARF misrepresented how it assigned a relative value to the co-owned patent, and that misrepresentation supports Washington University's equitable estoppel claim.

\*    \*    \*

In short, summary judgment was improper because factual disputes exist about the elements of estoppel.  Washington University put forward more than enough evidence of WARF's wrongful conduct to support a determination at trial that WARF is estopped from relying on its limitations defense.  In rejecting Washington University's assertion of equitable estoppel, the district court resolved

factual disputes in WARF's favor, when those disputes should have been left for trial.

## CONCLUSION

The grant of summary judgment to WARF, and the denial of Washington University's motion for partial summary judgment, on the timeliness of Washington University's contract claims should be reversed.   Washington University should be permitted to pursue its contract claims for breaches beginning six years before the parties' standstill agreement.   Washington University also should be permitted to show that WARF is equitably estopped from relying on the statute of limitations for any period.

Respectfully submitted,

JUNE 27, 2016

MICHAEL A. JACOBS
CHRISTOPHER ROBINSON
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105
Telephone:  415.268.7455

JOHN G. DAY
ANDREW C. MAYO
ASHBY & GEDDES, P.A.
500 Delaware Avenue
P.O. Box 1150
Wilmington, Delaware  19899
Telephone:  302.654.1888

s/ Deanne E. Maynard

DEANNE E. MAYNARD
MARC A. HEARRON
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Telephone:  202.887.8740

*Counsel for Plaintiff-Appellant*
*Washington University*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system on June 27, 2016.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: June 27, 2016                                    s/ Deanne E. Maynard

**THIRD CIRCUIT LAR 28.3(d) CERTIFICATION**

I hereby certify that at least one of the attorneys whose names appear on the brief is a member of the bar of this Court.


Dated:  June 27, 2016                                      s/ Deanne E. Maynard

## CERTIFICATE OF COMPLIANCE UNDER
## FRAP 32(a)(7)(C) AND THIRD CIRCUIT LAR 31.1(c)

This brief complies with the type-volume limitation of Rule 32(a) of the

Federal Rules of Appellate Procedure because it contains 12,816 words.

The text of the electronic brief is identical to the text in the paper copies.

A virus-detection program (Symantec EndpointProtection, v. 12.1) was run

on the file containing the electronic brief, and no virus was detected.

Dated:  June 27, 2016                          s/ Deanne E. Maynard

dc-837733